**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

PACKAGING SPECIALTIES,
INCORPORATED,

            Plaintiff,

v.

ANCHOR BAY PACKAGING
CORPORATION,

            Defendant.

_____/

HON. MARIANNE O. BATTANI

Civil No:    09-10232

## **OPINION AND ORDER REGARDING CLAIM CONSTRUCTION**

Before the Court are the parties' claim construction briefs relating to interpretation of a disputed claim term in U.S. Patent 6,832,562B2 ("the '652 patent"). In this patent infringement litigation, Plaintiff Packaging Specialties, Inc. ("PSI") and Defendant Anchor Bay Packaging Corporation ("Anchor Bay") have tasked the Court with claim construction pursuant to Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). At a hearing conducted on November 2, 2010, the parties agreed that the term "shelf flap," found in Claims 1 and 13, is the only term that requires construction at this time. PSI says that the Court should interpret the term broadly given its ordinary meaning in the context of the intrinsic record. Anchor Bay contends that the term is narrowly defined in the specification and that this definition should be read into the claims. For the reasons that follow, the Court construes "shelf flap" to mean: "a member that is bendable along a fold line and has a support surface engaging the face section of the shelf support block."

## I. BACKGROUND

Entitled "Shipping Container," the '652 patent was issued to Kurt, Kent, and Keith Tabor and is currently assigned to PSI. (Doc.1 Ex. A). Kurt Tabor explained that he conceived of the shipping container claimed in the '652 patent in response to certain European Union requirements that automotive sunroof shipping containers be manufactured from 100% recyclable materials. (Doc. 40 Ex. C). Anchor Bay developed a competing, nonpatented shipping container in response to the same requirements. PSI filed the instant civil action alleging that Anchor Bay's container infringes PSI's rights in the '652 patent.

The Court held a tutorial session in which the parties informed the Court about the industry context from which this dispute arose, provided physical exhibits of the shipping containers at issue, and described the elements of each container as they relate to the disputed claim term. After the session, the Court received concise briefing on the claims that require construction and conducted a <u>Markman</u> hearing on November 2, 2010.

## II. CLAIMS REQUIRING CONSTRUCTION

### A. U.S. Patent No. 6,832,562B2

At this point in the proceedings, the parties dispute what the term "shelf flap" means in Claims 1 and 13. The full text of these claims is set forth below. The claim term requiring construction is underlined.

#### 1. Claim 1

A container for shipping and storing manufactured articles, said container comprising:
    a container body having a base assembly and a plurality of wall assemblies, wherein each of said plurality of wall assemblies includes a wall panel with a lower edge attached to said base assembly, and at least one lateral edge joined to an adjacent wall panel;
    a plurality of shelf assemblies secured to said wall assemblies and protruding into an interior of said container body, each of said

plurality of shelf assemblies including at least one shelf support block and at least one <u>shelf flap</u> having a support surface; wherein said at least one <u>shelf flap</u> is attachable to said at least one shelf support block, thereby engaging the support surface with a face section located on the at least one shelf support block.

### 2. Claim 13

A shipping container with an integral interior shelf assembly comprising:
a container base;
a plurality of attached wall members, each of said wall members having a bottom edge affixed to an exterior side of said container base, said container base and said wall members defining an interior cavity;
a front wall assembly having a front wall panel with at least one attached positioning block and left and right flap sections connected to said front wall panel, said left and right flap sections being securable to said container body;
at least two shelf assemblies, said at least two shelf assemblies each comprising a plurality of <u>shelf flaps</u> mounted to at least one shelf support block; wherein
each of said plurality of <u>shelf flaps</u> has a planar support surface in substantially flush engagement with a face on said at least one shelf support block.

## III. CLAIM CONSTRUCTION STANDARDS

Claim construction is a process by which a court determines the meaning and scope of patent claims. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). When there is an allegation that a claim is ambiguous, or a dispute as to the meaning of a claim term, a court must "construe claims by considering the evidence necessary to resolve [such] disputes ... [and] assign a fixed, unambiguous, legally operative meaning to the claim." <u>Liquid Dynamics Corp. v. Vaughan Co., Inc.</u>, 355 F.3d 1361, 1367 (Fed.Cir.2004) (citing <u>Vitronics</u>

Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996)). The claim construction process is "simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." Embrex, Inc., v. Serv. Eng'g Corp., 216 F.3d 1343, 1347 (Fed.Cir. 2000) (quotation omitted). Claim construction is a matter of law for the Court. Markman, 52 F.3d at 979. The Court's task is limited to construing controverted claim terms. Vivid Technologies v. American Science & Engineering, Inc., 200 F.3d 795, 803 (Fed.Cir.1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

The claim construction analysis begins with the words of the claim. Vitronics Corp., 90 F.3d at 1582; Innova/Pure, 381 F.3d at 1116 ("[A] claim construction analysis must begin and remain centered on the claim language itself...."). The words of the claim are generally given their ordinary and customary meaning. Vitronics Corp., 90 F.3d at 1582. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313. The person of ordinary skill in the art views the claim term in the light of the entire intrinsic record. See, id.

The intrinsic record consists of the claim language, the specification, and the prosecution history. Phillips, 415 F.3d at 1312. "It is well settled that ... [s]uch intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp., 90 F.3d at 1582 (internal citation omitted). "The claims, specification, and the file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words,

4

competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention." Id. at 1583.

A court must always read the claim language in conjunction with the specification, which is "highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed item." Vitronics Corp., 90 F.3d at 1582; see also Phillips, 415 F.3d at 1315-16 (identifying the importance of the specification in claim construction). When reviewing the specification, the court should "determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitronics Corp., 90 F.3d at 1582 (alteration added); see also, Phillips, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."). "In determining whether a statement by a patentee was intended to be lexicographic, it is important to determine whether the statement was designed to define the claim term or to describe a preferred embodiment." E-Pass Tech., Inc. v. 3Com Corp., 343 F.3d 1364, 1369 (Fed. Cir. 2003). "Such special meaning, however, must be sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998). Accordingly, "claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of

5

manifest exclusion or restriction, representing a clear disavowal of claim scope. Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002).

When reviewing the specification and the claim, a court must keep in mind two axioms: (1) the claims must be construed in view of the specification and (2) reading a limitation from the specification into the claims is improper. See, Playtex Prods., Inc. v. Proctor & Gamble Co., 400 F.3d 901, 906 (Fed. Cir. 2005) (noting both axioms). The inherent tension between these axioms becomes apparent when "the written description of the invention is narrow, but the claim language is sufficiently broad that it can be read to encompass features not described in the written description, either by general characterization or by example in any of the illustrative embodiments." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 905 (Fed. Cir. 2004). When faced with this particular situation, a court should look " 'to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention,' and not merely to limit a claim term." Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1332 (Fed. Cir. 2001) (quoting Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998)). Moreover, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Decisioning.com, Inc. v. Federated Dept. Stores, Inc.,527 F.3d 1300, 1309 (Fed. Cir. 2008) (citing Liebel-Flarsheim Co., 358 F.3d at 906).

A court may also consider the prosecution history of the patent. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the

inventor understood the invention and whether the inventor limited the invention in the course of the prosecution, making the claim scope narrower than it otherwise would be." Phillips, 415 F.3d at 1317 (citing Vitronics Corp., 90 F.3d at 1582-83). While the history gives the claim language context, it should not be used to "enlarge, diminish, or vary the limitations in the claims." Markman, 52 F.3d at 980 (quotations omitted).

In addition to reviewing the available intrinsic evidence, a court may also receive extrinsic evidence "to aid [it] in coming to a correct conclusion as to the true meaning of the language employed in the patent." Markman, 52 F.3d at 980 (quotations omitted). Extrinsic evidence consists of all evidence external to the patent and prosecution history, including testimony of inventors or experts, dictionaries, and learned treatises. Id. "However, extrinsic evidence cannot be used to contradict the established meaning of the claim language." Gart v. Logitech, 254 F.3d 1334, 1340 (Fed. Cir. 2001). Ultimately, a court may arrive at the ordinary and customary meaning of a claim term by reviewing a variety of sources. Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1298 (Fed. Cir. 2003). These sources "include the claims themselves, dictionaries and treatises, and the written description, the drawings, and the prosecution history." Id. (internal citations omitted).

## IV. ANALYSIS

### A. Disputed Term: "Shelf Flap"

The disputed claim term "shelf flap" appears in Claims 1, 2, 7, 8, 9, 11, 13, and 15. The parties disagree what "shelf flap" means as used in Claims 1 and 13. Claims 1 and 13 are both independent claims. The term "shelf flap" is not expressly defined in the claims or the specification. The parties proposed constructions of that term are as follows:

| **Plaintiff / PSI:** | **Defendant / Anchor Bay:** |
|---|---|
| A member that is bendable along a fold line and has a support surface engaging the face section of the shelf support block. | A folded member constructed from multiple corrugated laminations having an upper member and a lower member, separated by a central fold line. The upper member has a plurality of attached foldable upper tabs that, with upper member, define a first channel. The lower member has a plurality of attached foldable lower tabs that, with lower member, define a second channel. The upper member and lower member each have a set of foldable end tabs, which are glued to each other when the shelf flap is in a fully folded configuration, and are secured by inserting a barbed tab into a slot. With end tabs secured, each shelf flap is roughly triangular in an end-view cross section, with closed ends. |

Plaintiff PSI acknowledges that while the "shelf flap" of the single preferred embodiment (shown as 54 in Figure 4 and 5 of the '652 patent) contains the tabs as described in Defendant's proposed construction, these tabs are not part of the broadest claim. Therefore, the Court should not read the limitations from the specification into the claim. Defendant Anchor Bay responds by arguing that the specification defines "shelf flap" with a visual depiction, Fig. 8, and a written description at column 4 on lines 24-48. Defendant contends that this is the only description giving notice to the public for the meaning of that term and must be limited accordingly.

The Court begins by noting that the parties agree that (1) there is no industry standard definition of "shelf flap" and (2) any construction of that term must include a fold line. Turning to the language of the claims themselves, Plaintiff acknowledges that "shelf

flap" means that same thing in claim 13 as it does in claim 1. A claim term must be given its ordinary meaning unless the patentee characterized the invention in the intrinsic record with words or expressions of manifest exclusion or restriction that represents "a clear disavowal of claim scope." Teleflex, 299 F.3d at 1325. Defendant notes that the specification contains only one preferred embodiment of the shelf flap structure. From that foundation, it argues that the Court should limit the definition of "shelf flap" to that single preferred embodiment, as described in column 4 on lines 24 – 48 of the specification. While Defendant is correct that '562 patent has but one preferred embodiment of the shelf flap, that observation does not end the analysis. The Federal Circuit has repeatedly and "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Laryngeal Mask Co. Ltd. v. Ambu, 618 F.3d 1367, 1372 (Fed. Cir. 2010) (quoting Phillips, 415 F.3d at 1323); Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1204-05 (Fed. Cir. 2002); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n. 14 (Fed. Cir. 1985) (en banc). When presented with this argument, a court should "not limit broader claim language to that single application unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Abbott Laboratories v. Sandoz, Inc., 566 F.3d 1282,1288 (Fed. Cir. 2009) (en banc) (internal quotations omitted). Therefore, the Court reviews the record to decide whether the inventors expressed a desire to limit the invention disclosed to the preferred embodiments contained in the specification.

The intrinsic record of the '652 patent does not show that the patentees clearly intended to limit the claim term "shelf flap" to the preferred embodiment. To the contrary, the patentees expressly rejected any limitation at all. In the final paragraph of the specification, immediately before the claims begin, the inventors plainly state: "It should be understood that the present description is for illustrative purposes only, and should not be interpreted to limit the scope of the present invention in any way." '652 Patent at col. 6, ll 14-15. Standing alone, this nonspecific boilerplate is not very helpful in the claim construction exercise. However, that qualifying statement is consistent with the specification's repeated reference to the "preferred embodiment," as well as descriptions of alternative embodiments of various substructures.

The inventors carefully and consistently used phrases throughout the specification such as: "in a preferred embodiment . . . ," "preferably constructed . . . ," "preferably glued . . . ," "preferably foldable . . . ," or "preferred embodiment of the present invention. . . . " See generally, id. at col. 2-6. These phrases reflect the inventors' teaching that those skilled in the art can embody the invention with "various modifications." Id. at col. 6, ll 17-18. Relatedly, the specification describes alternative ways to build the invention. This provides further evidence that the inventors' did not intend to have the specification limit the claim scope. See, id. at col. 6, ll 22-33 ("a preferred embodiment has been illustrated as having four walls, however, the shelf assembly that is an object of the present invention might find application in three sided or many sided containers, or even as a separate stand alone shelf ... substantial variations might be made to the number and positioning of shelf assemblies within the container, allowing goods of differing shapes and sizes to be positioned in the

same container ... the presently disclosed shelf assembly could find application in containers designed not for shipping, but for permanent storage or display of manufactured articles.")

The specification also describes at least three alternative embodiments of various substructures of the invention. These include the hinged support panel that could be attached to the sidewalls and the rear wall of the container in a wraparound fashion; the shelf assemblies may be attached only to the sidewalls of the container and not the back wall, and that the container may use a removable top or front wall assembly rather than secured panels. <u>Id</u>. at col. 2, ll 48-51; col. 2, ll 55-57; col. 6, ll 8-9. The fact that the inventors do not describe an alternative embodiment of the shelf flap, when they have included descriptions for alternative embodiments of other structures, does not show that the inventors clearly intended to limit the meaning of "shelf flap" solely to what they have described in the specification. The inclusion of these alternative embodiments is evidence that the inventors did not intend to limit their claims to the preferred embodiment.

Defendant's proposed construction comes from a section in the specification where the inventors clearly explain that the "shelf flap" described therein relates only to the preferred embodiment. Specifically, in Col. 4, from which Defendant pulls its proposed interpretation, the inventors explain:

> Referring now to FIG. 8, there is shown a flattened (unfolded) shelf flap 54 as used in the <u>preferred construction</u> of each shelf assembly 50 ... Each shelf flap 54 is <u>preferably</u> <u>constructed</u> of multiple corrugated laminations, however, some other material such as a flexible, non-corrugated material might be employed ... In a <u>preferred embodiment</u>, upper surface 57 and lower surface 58 each have a set of foldable end tabs 55, which are <u>preferably</u> glued to each other when shelf flap 54 is in a fully folded conformation, and are securable by inserting a barbed tab 76 into a slot 78 ... In a <u>preferred</u>

> embodiment, the end tabs 55 attached to shelf support surface 57 slope slightly downward with respect to support surface 57 when the shelf is fully constructed, facilitating loading of articles into container 10. A small foldable rectangular section 79 is <u>preferably</u> included on shelf flap 54, and can fold slightly outward to accommodate a shelf support block 52....

<u>Id</u>. at col. 4, ll 24-48 (emphasis added). This is a curious place from which the Defendant's source their proposed construction. The above passage makes clear that the inventors were describing the "shelf flap" of the preferred embodiment instead of defining what that term means in claims 1 and 13.

The intrinsic record leads to the conclusion that the specification's description of the "shelf flap" is not "the invention" itself, but rather the "preferred embodiment" of the invention. The Court rejects Defendant's argument that since the specification refers to one preferred embodiment, it becomes "the invention" and the claims must be limited accordingly. Defendant premised this argument on the claim construction principle that if the specification defines features of "the invention," rather than describing an *embodiment* of that invention, it is appropriate to apply to this definition to the claims. <u>See</u>, <u>Verizon Services Corp. v. Vonage Holdings Corp.</u>, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); <u>Honeywell International, Inc., v. ITT Industries, Inc.</u>, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (written description discussing "this invention" and "the present invention" may limit claim scope); <u>C.R. Bard, Inc. v. United States Surgical Corp.</u>, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."); <u>Newfrey, LLC v. Burnex Corp.</u>, 637 F.Supp.2d 527,

538 (E.D. Mich. 2008) ("It is a well established canon of claim construction that when a particular embodiment is described in the specification as the invention itself, and not just one way of utilizing it, the claims are not entitled to a scope broader than that embodiment."). As discussed above, the cited passages from the specification unambiguously describe the "shelf flap" of the preferred embodiment. The specification makes clear that description of the shelf flap is not "the invention," but rather the preferred embodiment of the invention. Therefore, the claim construction principle advanced by Defendant does not alter the Court's finding.

The doctrine of claim differentiation further undermines Defendant's proposed construction. The Federal Circuit has generally characterized the doctrine of claim differentiation as the "presumption that each claim in a patent has a different scope." Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006) (quoting Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325, 1330 (Fed. Cir. 2004)). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." Phillips, 415 F.3d at 1314 (citing Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir.1991)). When this doctrine is applied to a pair of independent claims, such as the case here, a court should determine whether a proposed construction "would render additional, or different, language in another independent claim superfluous." Curtiss-Wright, 438 F.3d at 1381. In this matter, the Court has compared the language of the unasserted independent claim 7 to the language of claims 1 and 13. Each of these three claims references a "shelf flap." Only claim 7 adds the additional limitations that the "first" and "second surfaces" of the "shelf flap" include "a plurality of foldable tabs" that are

13

"insertable through" "lateral slots" defined in a panel of the claimed "shelf assembly." Claim 7 essentially describes the preferred embodiment of the shelf flap. If the Court were to adopt Defendant's construction and restrict "shelf flap" to the preferred embodiment, the language relating to foldable tabs in claim 7 would be superfluous. The uniform use of "shelf flap" throughout claims 1, 7, and 13 demonstrates that the "plurality of foldable tabs" and related language in claim 7 is not inherent "shelf flap" as found in claims 1 and 13. The claim differentiation doctrine shows that the inventor did not intend for the specification to narrowly define "shelf flap." This doctrine persuades the Court that Defendant's construction is improper because it would make other claim terms in the '652 patent redundant.

Given the above discussion, this is not the rare case in which the Court will limit the claims to the preferred embodiment. See, Taskett v. Dentlinger, 344 F.3d 1337, 1340 (Fed. Cir. 2003) ("Though it is true that we must read a claim in light of the specification, rarely will we limit the claim to the preferred embodiments described in that specification." (citing Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1325 (Fed. Cir .2003))). Throughout the specification, the inventors explicitly state that the embodiment described therein is merely illustrative of the preferred embodiment and should not limit the various alternative forms the invention might take. The Court finds that a person of ordinary skill in the art would arrive at the conclusion that the patentees did not intend the specification's description of "shelf flap" to limit the definition of that term as used in claims 1 and 13.

Having rejected Defendant's construction, the Court finds that the intrinsic record validates Plaintiff's proposed construction. The specification teaches that the "shelf flap" can be constructed with bendable material. '652 Patent at col. 4, ll 26-28 ("Each shelf flap

54 is preferably constructed of multiple corrugated laminations, however, some other material such as a flexible, non-corrugated material might be employed."). The parties agree that any construction of "shelf flap" must include a fold line. The specification explains that each "shelf flap" has a fold line. Id. at col. 4, ll 29-31 ("Each shelf flap 54 has an upper surface 57 and a lower surface 58, separated by a central fold line 51"). Plaintiff then adds to its definition a support surface engaging the face section of the shelf support bar. The text of claims 1 and 13 supports this addition. Claim 1 provides, "at least one shelf flap is attachable to said at least one shelf support block, thereby engaging the support surface with a face section located on the at least one shelf support block." Id. at col. 6, ll 49-52. Claim 13 contains similar language, "each of said plurality of shelf flaps has a planar support surface in substantially flush engagement with a face on said at least one shelf support block." Id. at col. 8, ll 24-26. The specification further confirms Plaintiff's definition. Id. at col. 2, ll 17-20 ("Each of the plurality of shelf flaps has a support surface in substantially flush engagement with a face on the at least one shelf support block."). Accordingly, the Court adopts Plaintiff's proposed construction.

## V.    CONCLUSION

For the reasons discussed above, the Court adopts Plaintiff's proposed construction. The term "shelf flap," as used in Claims 1 and 13, means "a member that is bendable along a fold line and has a support surface engaging the face section of the shelf support block."

**IT IS SO ORDERED.**

s/Marianne O. Battani<br>MARIANNE O. BATTANI<br>UNITED STATES DISTRICT JUDGE

DATED: <u>December 13, 2010</u>

## CERTIFICATE OF SERVICE

Copies of this Order were served upon Petitioner and counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt<br>Case Manager