UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PACKAGING SPECIALTIES, INC.,

        Plaintiff,                      CASE NO. 09-10232

v.                                   HON. MARIANNE O. BATTANI

ANCHOR BAY PACKAGING CORP.,

        Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

This matter is before the Court on Defendant Anchor Bay Packaging's Motion for Summary Judgment of Invalidity. (Doc. 56). Plaintiff Packaging Specialties owns U.S. Patent 6,832,562B2 (the "'562 Patent"). The '562 Patent protects Plaintiff's corrugated board sunroof shipping container. In this patent infringement case, Plaintiff alleges Defendant's competing container infringes the '562 Patent. In its motion filed pursuant to Rule 56, Defendant argues the '562 Patent is invalid on the grounds of: (1) Public Use; (2) the "On-Sale" Bar; (3) Obviousness; and (4) Inequitable Conduct. The Court heard oral argument on September 9, 2011. For the reasons that follow, Defendant's motion is **DENIED**.

**I.     STATEMENT OF FACTS**

    **A.     Purpose of Plaintiff's Shipping Container**

For some time prior to the events in this case, Plaintiff Packaging Specialties had been supplying Inalfa Sunroofs with a metal shipping container which Inalfa used to ship its sunroofs to a Chrysler manufacturing plant in Graz, Austria. In late 1999, Inalfa

asked Plaintiff to redesign their container because it was causing damaged shipments and was too labor intensive to pack and unpack. (Doc. 67 Ex. F, pp. 33-37). Inalfa also requested that Plaintiff construct the revised container with corrugated board due to new European Union requirements. (Id.).

### B. Shipping Container, First Iteration

Plaintiff constructed the first iteration of its new corrugated board shipping container sometime in December 1999. Plaintiff and representatives from Inalfa and Chrysler conducted a private lab evaluation of the new container at the Lansmont testing facility. During a "shake down" test, the walls of the container bowed, and the sunroofs collapsed. (Doc. 67 Ex. M). Plaintiff decided to redesign and retest the container.

Kurt Tabor, Plaintiff's president, and Lawrence Dull, Plaintiff's packaging expert, explained that the design and evaluation of corrugated board containers requires a unique trial and error system because corrugated does not lend itself to the use of mathematical formulas or modeling techniques. (Doc. 67 Ex. H, ¶ 2; Ex. I, ¶ 9-10, Ex. J, pp. 2-7). Industry practice is to design, test, and redesign until satisfied. Id.

### C. Shipping Container, Revision #1

On January 5, 2000, Plaintiff successfully tested the first revision of its shipping container ("Rev. 1") at the CPR test labs, a private test facility. (Doc. 56 Ex. 21; Doc. 67 Ex. P). On or about January 17, Plaintiff gratuitously provided Inalfa with two Rev. 1 containers so that Inalfa could test the containers in field. On January 25, Inalfa sent Plaintiff a blanket purchase order for 600 Rev. 1 containers. (Doc. 67 Ex. R).

Kurt Tabor averred that, despite this "blanket" purchase order, the shipping container was still in a prototype stage, and its evaluation ongoing. (Doc. 67 Ex. H, ¶ 3). Plaintiff also explained that the "blanket" purchase order is considered a book-keeping placeholder in the automotive industry and is not directly indicative of any actual commercial sales. The record confirms Plaintiff's explanation: on January 31, before Plaintiff issued any containers against the January 25 purchase order, Inalfa directed Plaintiff to produce 100 Rev. 1 containers so that Inalfa "may evaluate prior to the run of the entire blanket order quantity 600 pieces." (Doc. 67 Ex. S). Plaintiff complied with Inalfa's request, and between February 11 and February 17, shipped Inalfa 36 Rev. 1 containers at 16.5% "good will" discount. (Doc. 56 Ex. 32; Doc. 67 Ex. 7 attached to Ex. I).

D.  Shipping Container, Revision #2

On February 18, Inalfa discovered that if the Rev. 1 containers were stacked two high on the tines of a forklift, the bottom collapsed. (Doc. 67 Ex. U). Kent and Keith Tabor (Kurt's brothers) investigated this problem between February 20 and February 23. At first, they believed that the wrong size staples had been used, but that correction failed. (Doc. 67 Ex. V, p. 14). Then, they added additional corrugated layers to the bottom, but that did not work. Finally, the brothers added die-cuts to the bottom panel, which corrected the problem ("Rev. 2"). (Doc. 67 Ex. F, p. 52). Dull testified this was not an obvious improvement over the Rev.1 container. (Doc. 67 Ex. I, ¶¶ 15-16; Ex. Z, pp. 51-53). Defendant's expert, Dr. Gregory Hulbert, said it was. (Doc. 56 Ex. 10, pp. 46, 62-63; Ex. 12, p. 19-20).

On February 28, 2000, Plaintiff sent Inalfa a quotation for the Rev. 2 container. (Doc. 67 Ex. X). On March 1, 2000, Inalfa entered a purchase order for the Rev. 2 container. (Doc. 67 Ex. Y).

### E. Confidentially During the Evaluation Period

Prior to the December 1999 testing at Lansmont, Plaintiff had requested that Inalfa sign a confidentiality agreement. (Doc. 67 Ex. V). Inalfa refused. Plaintiff admits that when it disclosed the Rev. 1 container to representatives from Inalfa and Chrysler, none of the parties were subject to an express confidentially agreement. (Doc. 56 Ex. 5, 96; Ex. 6, 28; Ex. 33). However, James Assenmacher, Plaintiff's sales representative, testified that based on his 47 years of industry experience, it was a "professional assumption" and "implied" that neither Inalfa or Chrysler would disclose anything regarding Plaintiff's container to any third parties. (Doc. 67 Ex. E, pp. 84-85). An Inalfa email in the record suggests that Inalfa understood that Plaintiff's corrugated shipping container was confidential, notwithstanding the absence of an express written agreement. (Doc. 67 Ex. AA).

### F. Plaintiff's Patent Filings

On February 20, 2001, Plaintiff filed a provisional patent application for its Rev. 2 shipping container. (Doc. 56 Ex. 17). On February 20, 2002, Plaintiff filed a nonprovisional patent application for the Rev. 2 container, claiming priority back to the earlier provisional application. (Doc. 56 Ex. 1). Thus, the one-year "critical date" used for the purposes of 35 U.S.C. §§ 102 and 103 started at midnight on February 20, 2000.

Plaintiff's Information Disclosure Statement and Prosecution File History do not contain any reference to the Rev. 1 container or any reference to any commercial or public activity prior to the critical date.  (Doc. 56 Ex. 18).

### G.     The '562 Patent

On December 21, 2004, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent 6,832,562B2 to Plaintiff.  (Doc. 56 Ex.1).  In this case, Plaintiff argues Defendant's shipping container infringes claims 1, 13, and 14 of the '562 Patent.  These claims are as follows:

**Claim 1**

A container for shipping and storing manufactured articles, said container comprising:
> a container body having a base assembly and a plurality of wall assemblies, wherein each of said plurality of wall assemblies includes a wall panel with a lower edge attached to said base assembly, and at least one lateral edge joined to an adjacent wall panel;
> a plurality of shelf assemblies secured to said wall assemblies and protruding into an interior of said container body, each of said plurality of shelf assemblies including at least one shelf support block and at least one shelf flap having a support surface; wherein
>  said at least one shelf flap is attachable to said at least one shelf support block, thereby engaging the support surface with a face section located on the at least one shelf support block.

**Claim 13**

A shipping container with an integral interior shelf assembly comprising:
a container base;
> a plurality of attached wall members, each of said wall members having a bottom edge affixed to an exterior side of said container base, said container base and said wall members defining an interior cavity;
> a front wall assembly having a front wall panel with at least one attached positioning block and left and right flap sections connected to said front wall panel, said left and right flap sections being securable to said container body;

5

> at least two shelf assemblies, said at least two shelf assemblies each comprising a plurality of shelf flaps mounted to at least one shelf support block; wherein
> each of said plurality of shelf flaps has a planar support surface in substantially flush engagement with a face on said at least one shelf support block.

> **Claim 14**
>
> The shipping container of claim 13 said container has two shelf assemblies affixed to two wall members

(Doc. 56 Ex. 1).

## II. STANDARD OF REVIEW

### A. Burden of Proof on a Patent Validity Challenge

"Under § 282 of the Patent Act of 1952, a patent shall be presumed valid and the burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." Microsoft Corp. v. i4i Ltd. P'ship, 131 S.Ct. 2238, 2242 (2011) (internal quotation marks and citation omitted). To overcome this statutory presumption, an accused infringer must establish their invalidity theory by clear and convincing evidence. Id. At all times during the litigation, the burden of persuasion remains with the party asserting invalidity. Tone Bros., Inc. v. Sysco Corp., 28 F.3d 1192, 1197 (Fed. Cir. 1994).

### B. Fed. R. Civ. P. 56

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52

6

(1986). Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III. ANALYSIS

Defendant argues there is no genuine issue of material fact that the '562 Patent is invalid on the grounds of: (1) Public Use; (2) the "On-Sale" Bar; (3) Obviousness; and (4) Inequitable Conduct. The Court reviews each basis of alleged invalidity.

### A. Public Use

7

Defendant argues the '562 Patent is invalid under 35 U.S.C. § 102(b) because the invention defined by claims 1, 13 and 14 was in public use before February 20, 2000. Defendant maintains the container was in public use because representatives of Inalfa and Chrysler not bound by any express confidentially agreement saw the container, persons not affiliated with Plaintiff could inspect the container while Inalfa conducted its field tests, and Plaintiff had no meaningful control over the container once Inalfa began its real world tests. Plaintiff argues the testing and evaluations did not place the container in public use under the circumstance presented.

An invention in "public use" prior to the critical date is unpatentable. See 35 U.S.C. § 102(b) ("A person shall be entitled to a patent unless the invention was . . . in public use . . . more than one year prior to the date of the application for patent in the United States."). The purpose of the public use bar to discourage "the removal of inventions from the public domain which the public justifiably comes to believe are freely available." Am. Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1267 (Fed. Cir. 2008) (internal quotation marks omitted) (quoting Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371, 1379 (Fed. Cir. 2004)).

Whether a patent is invalid on public use grounds is a question of law based on the underlying facts. Id. (citing Netscape Commc'ns Corp. v. Konrad, 295 F.3d 1315, 1319 (Fed. Cir. 2002)). The test for public use invalidity "is whether the purported use: (1) was accessible to the public; or (2) was commercially exploited." Id. (internal quotation marks omitted) (quoting Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1380 (Fed. Cir. 2005). A court looks to the "totality of the circumstances when evaluating whether there has been a public use within the meaning of section 102(b)."

Netscape, 295 F.3d at 1320.  This analysis includes a consideration of, among other things, "the nature of the activity involving the invention that occurred in public; public access to and knowledge of the public use; confidentiality obligations imposed upon observers; commercial exploitation; and the circumstances surrounding testing and experimentation."  Id.  "An invention is in public use if it is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality."  Id. (citing Petrolite Corp. v. Baker Hughes Inc., 96 F.3d 1423, 1425 (Fed. Cir. 1996).  However, it is well-establish that "an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention - even if such testing occurs in the public eye."  Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 64 (1998).

Defendant has failed to show by clear and convincing evidence that the inventors placed the '562 Patent into public use before February 20, 2000.  First, the testing of the prototype containers in private laboratories cannot reasonably be considered public use.  The public could not walk into either lab to observe the testing; access was strictly limited to representatives of Plaintiff, Inalfa, and Chrysler.  There is simply no evidence that an unrestricted number of people unconnected with the development of the container observed the container during its evaluation at the two private laboratories.

Second, there is a fact question regarding the level of public exposure the container had during real world testing.  Throughout the period when Inalfa shipped the test containers to Austria, view of the interior of the container was limited to Inalfa workers placing the sunroofs into the container and Chrysler workers opening and unpacking the containers on the assembly line.  To the extent that members of the

public saw the containers in transit, they would only see the exterior of the container. The entirety of the circumstances surrounding the exposure of the container to the public is unclear on the record presented. Thus, the Court cannot agree with Defendant that, as a matter of law, the real world testing of the container placed it in public use.

Third, although Plaintiff admits there is no express confidentiality agreement between it, Inalfa, and Chrysler, Plaintiff has presented evidence of an industry custom that would protect its container from public disclosure. (Doc. 67 Ex. E, pp. 84-85; Ex. V; Ex. AA). The absence of an express confidentiality agreement is but one factor the Court considers in assessing evidence of public use. See Am. Seating, 514 F.3d at 1268 ("[T]hat the inventors revealed the prototype to a select group of individuals without a written confidentiality agreement is not dispositive. When access to an invention is clearly limited and controlled by the inventor, depending upon the relationships of the observers and the inventor, an understanding of confidentiality can be implied."). Here, Plaintiff's evidence of an industry custom creates a fact question on whether Inalfa treated the container designs and evaluations as confidential.

Finally, given the nature of the invention, real world testing of the containers was reasonably required. Plaintiff's invention was an experimental shipping container made of corrugated board designed to travel overseas without damaging its fragile contents – large sunroof frames for automobiles. Real world testing and evaluation were both necessary and reasonable. In sum, against the heavy burden assigned to an accused infringer who challenges the validity of an issued patent, Defendant's evidence presents, at best, a genuine issue of material fact as to whether Plaintiff's invention was in public use prior to the critical date.

B.  **On-Sale Bar**

Defendant argues the '562 Patent is invalid under the "on-sale" bar of 35 U.S.C. § 102(b) because the claimed invention was both (1) the subject of a commercial offer for sale and (2) ready for patenting before the critical date. Plaintiff maintains there are genuine issues of material fact on whether the pre-critical date sales to Inalfa were for experimental purposes and whether the inventors had determined that their invention was suitable for its intended purpose at the time of these sales.

An invention "on-sale" prior to the critical date is unpatentable. See 35 U.S.C. § 102(b) ("A person shall be entitled to a patent unless the invention was . . . on sale in this country. . . more than one year prior to the date of the application for patent in the United States."). The on-sale bar prevents an inventor from commercializing his invention beyond the statutory term. STX, L.L.C. v. Brine, Inc., 211 F.3d 588, 590 (Fed. Cir. 2000) (citing Ferag v. Quip, Inc., 45 F.3d 1562, 1566 (Fed. Cir. 1995)).

Determining whether an invention is "on-sale" within the meaning of section 102(b) is a question of law based on the underlying facts. Dana Corp. v. Am. Axle & Mfg., Inc., 279 F.3d 1372, 1375 (Fed. Cir. 2002) (citing Intel Corp. v. Int'l Trade Comm'n, 946 F.2d 821, 829 (Fed. Cir. 1991). "[T]he § 102(b) on-sale bar applies when two conditions are met before the critical date: (1) the product is the subject of a commercial offer for sale, and (2) the invention is ready for patenting." August Tech. Corp. v. Camtek, Ltd., 655 F.3d 1278, 1288 (Fed. Cir. 2011) (citing Pfaff ,525 U.S. at 67).

Regarding the first condition, "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract

11

by simple acceptance (assuming consideration), constitutes an offer for sale under [section] 102(b)." Netscape, 295 F.3d at 1323. As for the second condition, it may be satisfied either "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Pfaff, 525 U.S. at 59. An invention is "reduced to practice" when the inventor has (1) constructed an embodiment; and (2) has determined that the invention would work for its intended purpose." Yorkey v. Diab, 601 F.3d 1279, 1286 (Fed. Cir. 2010) (citing Cooper v. Goldfarb, 154 F.3d 1321, 1327 (Fed. Cir. 1998).

Evidence of pre-critical date sales for experimental purposes may negate the application of the on-sale bar. Atlanta Attachment Co. v. Leggett & Platt, Inc., 516 F.3d 1361, 1365 (Fed. Cir. 2008) ("The law has long recognized a distinction between experimental usage and commercial exploitation of an invention."). "If the sale was primarily for experimentation rather than commercial gain, then the sale is not invalidating under § 102(b)." Electromotive Div. of General Motors Corp. v. Transp. Sys. Div. of General Elec. Co., 417 F.3d 1203, 1210 (Fed. Cir. 2005) (internal quotation marks omitted) (quoting Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1258 (Fed. Cir. 2001). "[T]he question is whether the transaction constituting the sale was not incidental to the primary purpose of experimentation, i.e., whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation of the facts surrounding the transaction, was to conduct experimentation." Id. (citations omitted).

In assessing the applicability of the experimental use negation doctrine, courts consider the following factors:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, . . . (9) the degree of commercial exploitation during testing[,] . . . (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1353 (Fed. Cir. 2002). Evidence of experimental use creates a genuine issue regarding the factual support for whether the inventors offered their invention for a commercial sale under the first prong of the Pfaff test. EZ Dock v. Schafer Sys., Inc., 276 F.3d 1347, 1352 (Fed. Cir. 2002).

Defendant has not presented clear and convincing evidence that the invention claimed in '562 Patent was "on-sale" before the critical date. Starting with the first prong of the Pfaff test, Plaintiff admits it sold Inalfa Rev. 1 containers before February 20, 2000. It characterizes those sales as part of its ongoing design evaluation process. The record shows that Plaintiff shipped 58 Rev. 1 containers to Inalfa for "evaluation" purposes. (Doc. 67 Ex. 7 attached to Ex. I; Ex. S). Plaintiff referred to these containers as "test packs" and sold them to Inalfa at a reduced "good will" price. (Doc. 67 Ex. U). Plaintiff did not sell, or offer to sell, Rev. 1 containers to any other customer. Although the Rev. 1 container was substantially complete, Plaintiff stated that the invention was not fully complete until Inalfa conducted three weeks of real world testing and the inventors added modifications represented in Rev. 2. As already discussed, testing of

the shipping container in its natural environment was reasonably required both as a matter of industry practice and common sense.

Additionally, the inventors were involved with Inalfa during the real world evaluation process, though the extent of their involvement is unclear. See (Doc. 67 Ex. E, pp. 133-34; Ex. F, pp. 39, 52). What is clear, however, is that this testing process led to the inclusion of die cuts in the additional bottom panels. These die cuts are specifically found in claim 3 of the '562 Patent. See (Doc. 56 Ex. 1). "When an inventor can show changes during experimentation that result in features later claimed in the patent application, this evidence is a strong indication that the activities of the inventor negated any evidence of premature commercial exploitation of an invention ready for patenting." EZ Dock, 276 F.3d at 1353; see also Electromotive, 417 F.3d at 1211. Here, the inventors' "post-sale" redesign of the shipping container sufficiently negates Defendant's assertion of premature commercial exploitation. Accordingly, Plaintiff has established a genuine issue of material fact as to whether the pre-critical date sales were for experimental purposes.

Turning to the "ready for patenting" prong of the Pfaff test, Defendant contends that the prototype shipping container was suitable for its intended commercial purpose and ready for patenting on January 5, 2000 after the successful testing at the CPR labs. The inventors testified their invention was not complete at that time. They have explained that they fully intended to continue testing many prototypes, of differing designs, under actual conditions, until they determined that Rev. 2 was suitable for the invention's intended purpose. It was not until after Rev. 2 was repeatedly tested under actual conditions that the inventors determined that their invention was suitable for its

14

intended task and therefore ready for patenting. This did not occur until they solved the forklift problems on February 23, 2000. Consequently, the record demonstrates a genuine issue of material fact as to when the inventors determined that their invention was suitable for its intended purpose.

### C. Obviousness and Inequitable Conduct

The Court declines to invalidate the '562 Patent on obviousness or inequitable conduct grounds in the context of the present motion. Defendant's obvious argument is conditioned on a finding that the Rev. 1 container is prior art. (Doc. 56, p. 26). Relatedly, the inequitable conduct argument is based on the allegation that Plaintiff intentionally failed to disclose prior art, i.e., the Rev. 1 container, to the USPTO. (Doc. 56, p. 27). The Rev. 1 container becomes prior art if the jury determines that it was used in public or offered for commercial sale under § 102(b). Therefore, the Court cannot definitively resolve the obviousness and inequitable conduct issues at this time. Accord Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd., 711 F.Supp.2d 913, 918 (W.D. Wis. 2010) (in ruling on cross-motions for summary judgment, district court declined to address invalidity arguments conditioned on the jury's factual determinations).

However, assuming that the Rev. 1 container is prior art, summary judgment on obviousness grounds remains improper because there is a battle of experts as to whether the Rev. 2 container was an obvious improvement over Rev. 1. Defendant's expert claims it was (Doc. 56 Ex. 10, pp. 46, 62-63; Ex. 12, pp. 19-20); Plaintiff's expert says it was not. (Doc. 67 Ex. I, ¶¶ 15-16; Ex. Z, pp. 51-53). Moreover, the jury must establish the factual underpinnings of the obviousness analysis. See Graham v. John

Deere Co., 383 U.S. 1, 17-18 (1966) (factual determinations required for the obviousness analysis include (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art, and (4) evidence of secondary factors, also known as objective indicia of non-obviousness).

Similarly, Defendant is not entitled to summary judgment on the basis of inequitable conduct even if the Court assumes Rev. 1 is prior art. "To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO. A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1290 (Fed. Cir. 2011). Taking the evidence in a light most favorable to Plaintiff, the inventors' nondisclosure of the Rev. 1 container, and related sales/experimental testing activity, demonstrates a legitimate interpretation of what constitutes "prior art" under U.S. patent law. Thus, on the proofs presented, Defendant has failed to show by clear and convincing evidence that the inventors acted with the specific intent to deceive the USPTO.

### IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion for Summary Judgment of Invalidity (Doc. 56).

**IT IS SO ORDERED.**

                                  s/Marianne O. Battani
                                  MARIANNE O. BATTANI
                                  UNITED STATES DISTRICT JUDGE

DATED: January 10, 2012

### CERTIFICATE OF SERVICE

    I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record, via the Court's ECF System.

                                            s/Bernadette M. Thebolt
                                            Case Manager